NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAMBERS OF<br>**SUSAN D. WIGENTON**<br>UNITED STATES DISTRICT JUDGE | MARTIN LUTHER KING COURTHOUSE<br>50 WALNUT ST.<br>NEWARK, NJ 07101<br>973-645-5903 |

December 19, 2024

Lauren Kober
United States Attorney's Office
District of New Jersey
970 Broad Street
Newark, NJ 07102
*Counsel for Plaintiff*

Madelyn K. White
Carter Ledyard & Milburn LLP
28 Liberty Street
41st Floor
New York, NY 10005
*Counsel for Defendant*

## LETTER OPINION FILED WITH THE CLERK OF THE COURT

**Re:** *United States v. Rita Gluzman*
**Criminal Action No. 23-1037 (SDW)**

Counsel:

Before this Court is Defendant Rita Gluzman's motion for early termination of supervised release pursuant to 18 U.S.C. § 3583(e)(1). (D.E. 5.) This Court having considered all relevant submissions,[1] and for the reasons stated herein, Defendant's motion is **DENIED**.

## BACKGROUND & PROCEDURAL HISTORY

The parties are presumed familiar with this case given its age, and they may refer to several prior opinions for a more detailed summary of the background.[2] In short, Defendant is guilty of

---

[1] This Court considered the parties' submissions as well as a letter from the Probation Office for the District of New Jersey ("Probation").

[2] *United States v. Gluzman*, 154 F.3d 49 (2d Cir. 1998) (per curiam) (denying appeal of conviction); *Gluzman v. United States*, 124 F. Supp. 2d 171 (S.D.N.Y. 2000) (dismissing habeas corpus petition); *United States v. Gluzman*, No. 7:96-CR-323 (LJL), 2020 WL 4233049 (S.D.N.Y. July 23, 2020) (granting compassionate release); *United States v. Gluzman*, No. 96-CR-323 (LJL), 2020 WL 6526238 (S.D.N.Y. Nov. 5, 2020) (denying government's motion for

murdering her estranged husband. 154 F.3d at 50. Her crime was "carefully planned" and gruesome. 124 F. Supp. 2d at 176. Defendant sought to "thwart [her husband's] attempts to divorce her and pursue a relationship with another woman," *id.* at 174, and she also seemed concerned that she was losing access to her and her husband's wealth.[3] After purchasing "axes and saws, latex gloves, and clean-up items," *id.*, Defendant and her cousin drove from New Jersey to her husband's New York apartment, "awaited [his] arrival[,] … murdered [him] with axes, then proceeded to dismember his body with the intent of hiding their crime," 154 F.3d at 50.

Following a 1997 jury trial, Defendant was convicted and sentenced to life imprisonment followed by five years of supervised release. (D.E. 6-4 at 7.) The Second Circuit affirmed. 154 F.3d at 50. In 2020, she was granted compassionate release and began her term of supervised release. 2020 WL 4233049, at *20. Jurisdiction was transferred from the Southern District of New York to the District of New Jersey in December 2023. (D.E. 1.) Defendant's term of supervised release will expire on July 28, 2025. (*Id.*)

On September 17, 2024, Defendant filed a motion for early termination of her supervised release. (D.E. 5.) The government opposed (D.E. 6), and Probation recommended against early termination. Defendant filed a reply brief through counsel on October 25, 2024 (D.E. 7), as well as a letter she wrote herself on November 15, 2024 (D.E. 8).

Defendant's primary reason for seeking supervised release is that her sister, who has been assisting with Defendant's rent payments, plans to stop doing so. (D.E. 8 at 1; D.E. 5-10 at 1–2.) Defendant anticipates being able to secure housing out of state or out of the country. (D.E. 5-10 at 2.) She seeks early termination of her supervised release so as not to "unnecessarily burden the Probation Department …, who will have to rule on" travel requests. (*Id.*) She also argues that she has been fully compliant, is suffering from severe medical conditions, and is "working diligently to … be a productive member of society," including by taking classes, participating in a reentry program, and emotionally supporting members of her community. (*Id.* at 1, 7–8.)

The government opposes early termination because of the seriousness of Defendant's crime and her recent conduct. (D.E. 6.) Defendant's family members have reported receiving, as recently as October 2024, messages from Defendant faulting them for selling her business "behind her back," claiming to be impoverished, and asking for money. (*Id.* at 13.) In October 2022, she appeared unannounced at a family member's house, stated that she was owed money, and refused to leave after being asked. (*Id.* at 12.) Although Defendant "disputes her family's characterization of the events that occurred during her attempted visit" (D.E. 7 at 3), her version of events is extremely sparse and does not actually deny the concerning behavior.[4] This contact troubles

---

reconsideration of compassionate release). For the sake of brevity, in this opinion, the case name will be removed from these cases' short form citations.

[3] One of the circumstances that Defendant states caused her stress and "a nervous breakdown" was that her husband "transferred most of the balance from our joint marital account to others." (D.E. 8 at 3.)

[4] Defendant states that she went to the family member's home "to try to obtain help and information," specifically "to locate [her] personal property" and "legal papers … kept in [the] basement" of the home. (D.E. 8 at 3.) She does not describe how her family members received her or whether they asked her to leave.

Defendant's family members and the government because, in their view, it was Defendant's "obsession with money to which she believed she was entitled from [her business]" that led her to murder her husband. (D.E. 6 at 11.) In November 2022, the family members involved in the visit were added to the no-contact list that is one of the terms of Defendant's supervised release. *United States v. Gluzman*, 96-cr-323 (LJL), D.E. 151, 1 (S.D.N.Y. Nov. 14, 2022). The government also points out that Defendant "offers no explanation as to how supervised release is keeping her from continuing to" reintegrate into society and serve her community. (D.E. 6 at 17.)

**STANDARD OF REVIEW**

Under § 3583(e)(1), "[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) … terminate a term of supervised release … at any time after the expiration of one year of supervised release … if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e); *see* Fed. R. Crim. P. 32.1(c)–(d);[5] *United States v. Melvin*, 978 F.3d 49, 52–53 (3d Cir. 2020). The burden is on the defendant to show that early termination is warranted. *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989). In deciding whether to modify a sentence in this manner, the Court has "broad discretion to consider all relevant information," as it does at an initial sentencing. *Concepcion v. United States*, 597 U.S. 481, 491 (2022); *see Melvin*, 978 F.3d at 52.

**DISCUSSION**

Defendant has not demonstrated that early termination of her supervised release is warranted now, as opposed to in July 2025 when it is set to expire. Her stated reason for seeking early termination is that her sister plans to stop assisting with rent payments, and she does not wish to burden Probation by applying for permission to travel. (D.E. 5-10 at 2.) While this may be a nice sentiment, it is no reason to reduce a criminal sentence. Defendant's supervised release is not a mere formality that can be written off for the sake of convenience, whether her own or Probation's. Defendant can, as intended when the sentence was imposed, seek the necessary permissions to move. Just as Defendant's supervised release conditions exist for a reason, so does Probation. It surely will not be unduly burdened by Defendant's compliance with the conditions of her supervised release, as evidenced by its own recommendation against early termination in this case.

Supervised release also does not appear to prevent Defendant from doing anything else that she needs. She suggests that "the continued difficulties caused by her age [and] medical issues" warrant early termination, for example (*id.* at 5), but she does not explain how early termination will somehow ameliorate those conditions, by allowing further access to care or otherwise. This is unsurprising; Defendant was placed on supervised release in part so that she *could* manage her medical conditions better than she could in prison. 2020 WL 4233049, at *15 (granting compassionate release in part because Defendant's "medical condition … substantially

---

[5] While a hearing is sometimes required under Federal Rule of Criminal Procedure 32.1(c) before a court may modify a term of supervised release, a "hearing is not required if … the relief sought is favorable to [the defendant] and does not extend the term" of supervised release. Fed. R. Crim. P. 32.1(c)(2)(B). Accordingly, this Opinion is issued without oral argument.

3

diminishe[d] her ability to provide self-care within the environment of the correctional facility"). Her submission provides no basis on which to conclude that supervised release exacerbates her being "elderly and suffering from a number of significant health conditions." (D.E. 5-10 at 10.)

She similarly asserts that "supervised release hinders her ability to interact with [friends] and thus hinders her development of the necessary social ties to be a productive member of society." (*Id.* at 8 (citing D.E. 5-5; D.E. 5-7).) The letters cited for this proposition, however, do not explain that hindrance. The friends state that they would like Defendant to "attend a school function or a holiday dinner" (D.E. 5-5 at 1) or even "have [Defendant] come live with [them]" (D.E. 5-7 at 1). Supervised release does not foreclose those possibilities; in one of the same letters, Defendant's friends write that they *have* "enjoyed long conversations and dinner with her in person." (*Id.*; *see also* D.E. 5-4 at 1 (describing how Defendant supervised friend's children and taught them to cook and do yoga following her release).) Defendant has also participated in a reentry program and taken courses while on supervised release. (D.E. 5-10 at 7–8.) She is encouraged to work with Probation to continue to do such things and see her friends.

The 18 U.S.C. § 3553(a) factors also do not support early termination. Defendant's underlying conduct was undeniably troubling, and it was bound up with family and financial matters. Her recent communications indicate that Defendant feels she is owed money and that her family has been disloyal. (*See, e.g.*, D.E. 6 at 13 (providing text message in which Defendant wrote "You betraid [sic] me … People can not believe that you did such cruel action to the sister who brought you to this country."); D.E. 8 at 1 ("[The company] I started … was sold for 460 million dollars, and the money was split between my sister's and my son's families. I did not receive a single dollar.").) As discussed above, her recent actions also warranted adding more family members to her no contact list. Considering "the need for the sentence imposed … to protect the public from further crimes of the defendant," § 3553(a)(2)(C), this recent behavior militates against early termination of her supervised release.

Also relevant to the § 3553(a) factors, Defendant argues that the twenty-four years she has already served in prison "afford[ed] significant deterrence." (D.E. 5-10 at 10.) Assuming that is true, early termination is still not warranted in light of her recent conduct. As Defendant points out, supervised release "fulfills rehabilitative ends, distinct from those served by incarceration," including assisting a defendant's "transition to community life." (D.E. 7 at 1–2 (citing *United States v. Johnson*, 529 U.S. 53, 54–55 (2000)).) Defendant's recent interactions with family members, resulting in the addition of some of them to her no-contact list, demonstrate that supervised release still has a role to play in facilitating her transition.

Finally, Defendant argues that the need to avoid "federal/state sentencing disparities" warrants early termination of her supervised release. (D.E. 5-10 at 10 (citing *United States v. Johnson*, 505 F.3d 120, 123 n.4 (2d Cir. 2007)).) Defendant has raised this argument before, and it influenced the decision to grant her compassionate release. 2020 WL 4233049, at *20 (expressing concern over potential for sentence disparities based on "happenstance"). When that occurred, it was well known that a period of supervised release would follow. *See id.* (directing counsel "to confer regarding proposed release conditions"). Defendant's prior reliance on this argument does not preclude this Court from considering it, but the stakes are very different now. Defendant is not seeking compassionate release from prison at age seventy-one. Instead, she seeks to end a term of supervised release that is set to expire in less than a year and does not prevent her

4

from receiving medical care, interacting with members of her community, or even moving. Any need to avoid disparities between state and federal sentences does not outweigh Defendant's recent concerning behavior and her failure to state a basis for early termination.

In sum, this Court is not satisfied that early termination is warranted by Defendant's conduct or the interest of justice as required under § 3583(e)(1). While she states that she "ha[s] just months left to find" a place to live and will "risk becoming homeless," she does not explain why she cannot seek permission to move within the terms of her supervised release. (D.E. 8 at 1, 4.) Defendant need not worry about burdening Probation, and she is encouraged to seek the permissions she needs to find housing.

## CONCLUSION

For the foregoing reasons, Defendant's motion is **DENIED**. An appropriate order follows.

/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:    Parties